NOTICE
Decision filed 07/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260227-U

NO. 5-26-0227

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* LAEKON D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cumberland County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-18 |
| | ) | |
| Skye A., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Boie and Clarke concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's findings of parental unfitness and termination of Mother's parental rights after the best interest of the child hearing were not against the manifest weight of the evidence.

¶ 2     The respondent, Skye A. (Mother), appeals the circuit court's order granting the State's motion to terminate her parental rights. Mother challenges the circuit court's finding that she was unfit for failing to make reasonable efforts to correct the conditions that that were the basis for the removal of her child, Laekon D., within the nine-month period of December 18, 2024, to September 17, 2025, and failing to make reasonable progress toward the minor's return for the same nine-month period. Mother also challenges the best interest finding, asserting that it was not

1

in the minor's best interest that her parental rights be terminated. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This case arose from a hotline report alleging a domestic battery took place on July 5, 2023, in front of Laekon, born in June of 2021. The allegation was that Mother and her then-paramour, Clinton R., got into a verbal argument that became a physical altercation. In the altercation, Clinton allegedly took a machete and held it to Mother's throat while she was trying to feed Laekon. Clinton then allegedly stated that he was going to cut off all of Mother's toes and drown Laekon in front of Mother.

¶ 5      The Department of Children and Family Services (DCFS) subsequently investigated the hotline report on July 31, 2023. During the investigation, DCFS attempted to drug test Mother, but she refused, stating that she would be positive for "the same stuff" she tested positive for in a separate 2022 DCFS investigation; Mother subsequently confirmed that she would test positive for methamphetamine. Mother admitted to using methamphetamine multiple times between the dates of July 7, 2023, to July 29, 2023. Mother asserted that Laekon was in her sole care between the aforementioned dates. On July 31, 2023, protective custody was taken; DCFS asserted the reason for the necessity was "the substance abuse and witnessing the violent domestic violence incident." The temporary custody order also cited the substance abuse and the domestic violence as the reason for immediate and urgent removal. Mother ultimately entered an admission in the adjudicatory hearing on September 11, 2023, admitting that Laekon was neglected in that she was in an environment that was injurious to her welfare. Laekon was adjudged a ward of the court in an adjudicatory hearing entered on September 15, 2023. Custody and guardianship was subsequently placed with DCFS in a dispositional order entered on October 2, 2023.

2

¶ 6    Mother's service plan was: (1) to seek and maintain sufficient employment to adequately support her household, (2) obtain adequate housing for her and Laekon, (3) complete parenting education, (4) fully participate in a domestic violence assessment and complete all recommended services, (5) submit to random drug screenings, (6) complete a mental health assessment and complete all recommended services, and (7) complete a substance abuse assessment and complete all recommended services. Mother exhibited difficulty completing some of the facets of her service plan, but—prior to the relevant nine-month period—Mother completed her domestic violence assessment and the accompanying services, her parenting education, and a four-week in-patient substance abuse program. She did not complete an out-patient substance abuse program.

¶ 7    Though this case began in July of 2023, our review is limited to the relevant nine-month period upon which Mother was found unfit, from December 18, 2024, to September 17, 2025. On October 20, 2025, the State filed a motion to terminate Mother's parental rights, alleging that, within the aforementioned nine-month period, Mother failed to make reasonable efforts to correct the conditions that were the basis for Laekon's removal pursuant to section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2024)), and failed to make reasonable progress toward the return of Laekon pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)) during the same period.

¶ 8    On December 18, 2025, a hearing was held on the State's motion to terminate Mother's parental rights. The circuit court considered Mother's service plan, and what she had accomplished in the relevant nine-month period. During that nine-month period, Mother, for the first time in the pendency of this case, became employed at a gas station in Greenup, Illinois, on August 12, 2025. Mother provided two paystubs for the first four weeks of October 2025, totaling $946.59. Mother

3

testified that she paid $40 a day to get to and from work, and that she worked five days a week; this would be an expense of $800 over a four-week span.

¶ 9     Mother was living in a mobile home that the caseworker testified was not adequate from its appearance on the outside. The caseworker also testified that, though she made numerous attempts both before and during the relevant nine-month period, she was never able to inspect the interior of the home to determine if it was suitable for a child.

¶ 10    Mother tested negative for controlled substances twice, on July 23 and September 9 of 2025. Mother failed or refused to engage in random drug screenings eight times, on January 2, January 3, January 10, March 25, April 2, May 6, May 25, and July 18 of 2025. Mother tested positive for methamphetamine eight times also, on December 29, 2024, and January 13, March 3, March 10, March 17, April 9, April 25, and May 12 of 2025. Throughout the pendency of the case, Mother cited transportation difficulties as the reason why she failed to appear for many of her drug screens, however the caseworker testified that she would often times offer to personally transport Mother to her drug screenings.

¶ 11    Regarding Mother's mental health services for the relevant period, Mother reengaged with mental health services on December 26, 2024. Of the 20 appointments Mother had within the relevant period, she attended 12, cancelled or failed to appear for 4, and staff cancelled 4. It was noted during the hearing on the motion to terminate parental rights that Mother chose to stay in mental health services, though she had reached her mental health goal.

¶ 12    Mother failed to engage in any DCFS approved out-patient substance abuse services. Mother failed to return to one service provider, ABBCON, because she incurred a debt after disputing a positive drug screen, and failed to make any payment arrangements with the service provider to be able to reengage with service. Mother also had an intake appointment with another

4

servicer provider, Hour House, but failed to show up for the intake appointment and failed to call ahead to cancel. She also failed to reschedule or reengage with Hour House. Mother did engage with an unapproved online service provider, but DCFS informed Mother on multiple occasions that working with the online service provider would not satisfy her out-patient substance abuse service requirement.

¶ 13    At the end of the hearing on the motion to terminate Mother's parental rights, the circuit court took the matter under advisement. In the next hearing, on February 9, 2026, the circuit court pronounced its ruling. The circuit court noted that Mother incurred the debt to ABBCON because she requested additional testing on a positive drug test, and she would have been able to reengage with ABBCON if she arranged a payment plan, but she failed to do so. The circuit court acknowledged that Mother no-call, no-showed her intake appointment with Hour House, and also failed to reschedule or reengage. The circuit court stated that Mother began substance abuse treatment with an unvetted and unapproved substance abuse service, and the circuit court gave no weight to any negative drug screens from the online service because they were self-administered. The circuit court stated that it believed Mother had completed mental health services and domestic violence treatment. The circuit court emphasized Mother's continued methamphetamine use, citing her multiple positive tests and no-shows. The circuit court said that, based on the exterior of the home and the multiple failed attempts to observe the interior, a reasonable inference was raised that the home was not fit for Laekon to return. The circuit court stated that Mother started working at the end of the nine-month period and, though Mother completed her parenting courses and regularly attended visitation, she had been encouraging Laekon to misbehave during visitation. The circuit court noted that Laekon had been in care for 29 months before finding Mother was unfit for failing to make reasonable efforts to correct the conditions that were the basis for the

5

removal of Laekon within the 9-month period of December 18, 2024, to September 17, 2025, and failing to make reasonable progress toward the minor's return for the same 9-month period by clear and convincing evidence.

¶ 14    During the best interest hearing on March 11, 2026, the caseworker testified to many of the best interest factors. The caseworker testified that she had no concerns regarding Laekon's physical safety, that she has adequate food, the house she lives in is nice, and she has adequate clothing. The caseworker also stated that Laekon appears to be in good health, she is up to date on her medical and dental appointments and goes to therapy every other week. The caseworker stated that Laekon has a good sense of identity, and her foster home is culturally similar, stating that "she fits right in." The caseworker said that there is a good bond between Laekon, her foster mother, and her foster siblings. The caseworker acknowledged that Laekon appears to feel loved, she appears attached to her foster placement, calling her foster mother "mother" and calling her foster siblings her "brothers and sisters." The caseworker stated that her foster family seems to value her, that Laekon appears to have a sense of security, and that this foster home is her least disruptive placement. The caseworker also noted that Laekon has been in her foster placement for two years without interruption. The caseworker stated that Laekon appears to like it at the foster home, and that "[s]he's very set on where she's at *** she's comfortable there." The caseworker testified that Laekon goes to school at Franklin, and the foster mother has agreed to let Mother visit Laekon. The caseworker also stated that the foster mother wants to keep Laekon permanently.

¶ 15    Mother also testified during the best interest hearing. Mother testified that she would bring gifts and snacks to Laekon during visits. She stated that each would show the other affection and that Laekon would call her mom. She said she had an interest in Laekon's health and education, and loves her. She also stated that, though she believes it is in Laekon's best interest to stay with

her, she had no objections to Laekon's care while in foster care, and that she seems well taken care of.

¶ 16    The circuit court found that the factors weighed against Mother and noted that, if it was simply determining if Mother loved or cared for Laekon it would be a simple analysis, but it had to weigh the factors for the best interest of the child. Resultingly, the circuit court granted the State's motion to terminate Mother's parental rights. Notice of appeal was timely filed on March 18, 2026.

¶ 17                                        II. ANALYSIS

¶ 18    On appeal, Mother argues that the circuit court's findings of unfitness and termination of her parental rights were against the manifest weight of the evidence.

¶ 19    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 20    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be

7

terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 21                                    A. Unfitness

¶ 22    In this case, the State's alleged grounds for unfitness were failure to make reasonable efforts to correct the conditions that were the basis for removal of the minor during the nine-month period of December 18, 2024, and September 17, 2025, under section 1(D)(m)(i) of the Adoption Act; and failure to make reasonable progress to correct the conditions that were the basis for removal of the minor during the same nine-month period under section 1(D)(m)(ii) of the Adoption Act. Since we need only find one of the grounds for unfitness has been proven by clear and convincing evidence to move on to a consideration of whether the termination of parental rights was in the best interest of the child, we choose to only analyze the reasonable progress finding. See *In re D.C.*, 209 Ill. 2d 287, 296 (2004).

¶ 23    Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or

demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.* " 'The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child.' " (Emphasis in original.) *In re C.R.*, 221 Ill. App. 3d 373, 380 (1991) (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991)). A respondent's personal circumstances preventing them "from making reasonable progress is irrelevant to the ' "objective standard." ' " *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 73 (quoting *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89). "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and court's directives, in light of the condition which gave rise to the removal of the child, and *** other conditions which later became known" that would prevent the circuit court from returning custody to the parent. *In re C.N.*, 196 Ill. 2d at 216-17.

¶ 24    Of the five remaining services on Mother's service plan during the relevant nine-month period, the circuit court only determined mental health services were completed. When reviewing the remaining four services, it is clear why a finding of failure to make reasonable progress was appropriate here. First, the four paystubs Mother provided combined with her testimony leaves her with roughly $150 a month, which cannot be said would be enough funds to satisfy the first facet of her service plan that she gain employment adequate to support her household. Beyond the funds, however, is the fact that the home Mother lived in during the nine-month period was never made accessible to be evaluated for its livability for Laekon, and the outside of the home supported the inference that the interior was actually not livable. Without a livable home, or one soon to be acquired, it cannot be said that Mother could take custody of Laekon in the near future.

¶ 25 Regarding Mother's substance abuse, two negative drug screens were a great start to living drug-free. Those negative drug screens, however, are overshadowed by the 16 positive or unattended drug screens within the same nine-month period. The two negative drug screens also are not indicative of Mother's future compliance with random drug screens. Finally, Mother completely refused to engage with a DCFS approved out-patient substance abuse provider when there were two available options. As such, it cannot be said that she will be able to have fully complied with out-patient treatment in the near future. The circuit court's finding of unfitness was not against the manifest weight of the evidence.

¶ 26                                    B. Best Interest

¶ 27 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 28 In making a best interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

10

See section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)).

¶ 29      As with the circuit court's findings at the unfitness stage, we afford the circuit court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 30      Much of what Mother testified to during the best interest hearing centered around what Mother wanted, how much she loved Laekon, and how much she cared for her. However, the primary focus is the best interest of the child. The only factors Mother asserts on appeal to support her position that it is not in the best interest of Laekon for her rights to be terminated are Laekon's sense of attachment (see 705 ILCS 405/1-3(4.05)(d) (West 2024)) and continuity of relationships with parent figures (see *id.* § 1-3(4.05)(g)). In that regard, Mother asserts, "The undisputed testimony heard at the best interest hearing directly relates to several best interest factors, including Laekon's sense of attachment, familiarity, continuity of affection, and continuity of relationships with parent figures." At the time of the best interest hearing, Laekon had been with her foster family for 2 years, out of Mother's care for 31 months, and alive for less than 5 years. Mother's argument as to Laekon's "continuity" or "familiarity" with Mother is rebutted by those facts and is quite certainly disputed. The only remaining argument, that there was a sense of attachment to Mother, is not supported by the evidence. Rather, the evidence demonstrated that Laekon had an attachment to her foster family.

¶ 31      The testimony provided at the best interest hearing overwhelmingly supports Mother's parental rights being terminated. See *id.* § 1-3(4.05)(a). The caseworker had no concerns regarding Laekon's physical safety. See *id.* She had adequate food, the house she lived in was nice, and she had adequate clothing. See *id.* Mother even believed Laekon was being well cared for. See *id.* The

11

caseworker also testified that Laekon appeared to be in good health, was up to date on her medical and dental appointments, and went to therapy every other week. See *id.* The caseworker stated that Laekon had a good sense of identity, and her foster home was culturally similar, stating that "she fits right in." See *id.* § 1-3(4.05)(b)-(c). The caseworker stated that there was a good bond between Laekon, her foster mother, and her foster siblings. See *id.* § 1-3(4.05)(d). The caseworker acknowledged that Laekon appeared to feel loved, and appeared attached to her foster placement, calling her foster mother "mother" and calling her foster siblings her "brothers and sisters." See *id.* § 1-3(4.05)(d)(i). The caseworker stated that her foster family seemed to value her, that Laekon appeared to have a sense of security, and that this foster home was her least disruptive placement. See *id.* § 1-3(4.05)(d)(i)-(ii), (d)(v). The caseworker also testified that Laekon had been in her foster placement for two years without interruption. See *id.* § 1-3(4.05)(d)(iv). The caseworker stated that Laekon appeared to like it at the foster home, and that "[s]he's very set on where she's at *** she's comfortable there." See *id.* § 1-3(4.05)(e). The caseworker testified that Laekon goes to school at Franklin, and the foster mother has agreed to let Mother visit Laekon. See *id.* § 1-3(4.05)(f)-(g). The caseworker also explained that the foster mother wants to keep Laekon permanently. See *id.* § 1-3(4.05)(j). As such, the circuit court's finding that it was in the best interest of the child for Mother's rights to be terminated was not against the manifest weight of the evidence.

¶ 32                                    III. CONCLUSION

¶ 33    For the foregoing reasons, the circuit court's orders of unfitness and termination of Mother's parental rights are affirmed.


¶ 34    Affirmed.